[Cite as *Westport Ins. Corp. v. Stark Cty. Sanit. Eng. Dept.*, 2017-Ohio-7573.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| WESTPORT INSURANCE CORP. | : | JUDGES: |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. W. Scott Gwin, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| STARK COUNTY SANITARY | : | Case No. 2017CA00006 |
| ENGINEERING DEPARTMENT | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:    Appeal from the Court of Common
                            Pleas, Case No. 2015CV02301


JUDGMENT:                   Reversed


DATE OF JUDGMENT:           September 11, 2017


APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

MARTIN T. GALVIN                      JOHN D. FERRERO
DANIELLE N. BENNETT                   Stark County Prosecuting Attorney
101 West Prospect Avenue              By: STEPHAN P. BABIK
Suite 1400                            JESSICA L. LOGOTHETIDES
Cleveland, OH  44115-1093             110 Central Plaza South
                                      Suite 510
                                      Canton, OH  44702

*Wise, Earle, J.*

{¶ 1} Defendant-Appellant, Stark County Sanitary Engineering Department, appeals the January 13, 2017 judgment entry of the Court of Common Pleas of Stark County, Ohio denying its motion for summary judgment on the issue of sovereign immunity, and granting Plaintiff-Appellee, Westport Insurance Corporation, leave to amend its complaint.

FACTS AND PROCEDURAL HISTORY

{¶ 2} On June 18, 2014, flooding occurred at a six unit apartment building located at 7700-7732 Peachmont Avenue, NE, near Nimishillen Creek in North Canton, Ohio, causing substantial property damage. The area had experienced an excessive amount of rainfall over a few days, with 2.49 inches of rain falling in a short period of time on the day in question.

{¶ 3} Wastewater from the building is collected by the Stark County Metropolitan Sewer District, created and operated by the Board of Stark County Commissioners. The property is serviced by the Waltham Lift Station (LS #24), a pump station that takes flow from a lower grade to a higher grade so that it may continue on a gravity sewer line. Appellee compensated the building owners for their property damages.

{¶ 4} On November 4, 2015, appellee, as a subrogee, filed a complaint against appellant for negligent maintenance of its sanitary sewer system. On December 3, 2015, appellant filed an answer, claiming the affirmative defenses of failure to join necessary parties, sovereign immunity, and it is not sui juris, capable of being sued or bringing suit.

{¶ 5} On October 31, 2016, appellant filed a motion for summary judgment, claiming as a political subdivision, it was entitled to immunity under R.C. Chapter 2744.

Appellant argued the sewer backup was caused by a torrential rainstorm, not a maintenance issue. Appellant claimed the Waltham Lift Station was thoroughly and consistently maintained and was inspected on a daily basis, and attached numerous maintenance records in support. Appellant also argued it was not sui juris and therefore not capable of being sued.

{¶ 6} On November 14, 2016, appellee filed its response, arguing appellant was not entitled to immunity as its claim fell under one of the exceptions to sovereign immunity, and arguing genuine issues of material fact existed that must be considered by a jury. Appellee did not address the sui juris argument.

{¶ 7} On November 28, 2016, appellant filed a memorandum contra appellee's motion for leave to amend the complaint which was purportedly filed on November 22, 2016. However, there is no such filing in the record. Appellant argued Civ.R. 15(C) did not permit appellee to amend its complaint pursuant to Civ.R. 3(A) and applicable case law.

{¶ 8} By judgment entry filed January 13, 2017, the trial court denied appellant's motion for summary judgment, finding genuine issues of material fact to exist as to whether the subject sewer system was properly maintained, and granted appellee leave to amend its complaint to substitute the proper party defendant.

{¶ 9} Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:

I

{¶ 10} "THE TRIAL COURT ERRED BY DENYING THE STARK COUNTY SANITARY ENGINEERING DEPARTMENT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO R.C. CHAPTER 2744."

II

{¶ 11} "THE TRIAL COURT ERRED BY DENYING THE STARK COUNTY SANITARY ENGINEERING DEPARTMENT'S MOTION FOR SUMMARY JUDGMENT BECAUSE THE STARK COUNTY SANITARY ENGINEERING DEPARTMENT IS NOT *SUI JURIS* AND IS NOT CAPABLE OF SUING OR BEING SUED."

I

{¶ 12} Appellant claims the trial court erred in denying its motion for summary judgment under R.C. Chapter 2744.  We agree.

{¶ 13} Summary Judgment motions are to be resolved in light of the dictates of Civ.R. 56.  Said rule was reaffirmed by the Supreme Court of Ohio in *State ex rel. Zimmerman v. Tompkins,* 75 Ohio St.3d 447, 448, 663 N.E.2d 639 (1996):

Civ.R. 56(C)   provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made.   *State ex. rel.*

*Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379,

citing *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O3d

466, 472, 364 N.E.2d 267, 274.

{¶ 14} As an appellate court reviewing summary judgment motions, we must stand in the shoes of the trial court and review summary judgments on the same standard and evidence as the trial court. *Smiddy v. The Wedding Party, Inc.,* 30 Ohio St.3d 35, 506 N.E.2d 212 (1987).

{¶ 15} As explained by this court in *Leech v. Schumaker,* 5th Dist. Richland No. 15CA56, 2015-Ohio-4444, ¶ 13:

It is well established the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). The standard for granting summary judgment is delineated in *Dresher v. Burt* (1996), 75 Ohio St.3d 280 at 293: " * * * a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case. Rather, the moving

party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed in the light most favorable to the opposing party. *Williams v. First United Church of Christ* (1974), 37 Ohio St.2d 150.

{¶ 16} In *Greene County Agricultural Society v. Liming,* 89 Ohio St.3d 551, 556-557, 733 N.E.2d 1141 (2000), the Supreme Court of Ohio explained the three tier analysis required for determining if sovereign immunity applies:

R.C. Chapter 2744 sets out the method of analysis, which can be viewed as involving three tiers, for determining a political subdivision's immunity from liability. First, R.C. 2744.02(A)(1) sets out a general rule that political subdivisions are not liable in damages. In setting out this rule, R.C. 2744.02(A)(1) classifies the functions of political subdivisions into governmental and proprietary functions and states that the general rule of immunity is not absolute, but is limited by the provisions of R.C. 2744.02(B),

which details when a political subdivision is not immune. Thus, the relevant point of analysis (the second tier) then becomes whether any of the exceptions in R.C. 2744.02(B) apply. Furthermore, if any of R.C. 2744.02(B)'s exceptions are found to apply, a consideration of the application of R.C. 2744.03 becomes relevant, as the third tier of analysis.

{¶ 17} In its November 4, 2015 complaint, appellee alleged appellant negligently maintained the sewer system which resulted in a flood causing damage to its insured's property. The complaint alleged the maintenance of a sewer system is a proprietary function and therefore appellant is exempt from immunity under R.C. Chapter 2744.

{¶ 18} In its October 31, 2016 motion for summary judgment, appellant argued the sewer system was properly maintained, and the flooding was caused by a torrential rainstorm. Appellant argued R.C. Chapter 2744 provides immunity to political subdivisions, unless the claim falls within an enumerated exception. R.C. 2744.02(A)(1) states the following in pertinent part: "Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." R.C. 2744.01(G)(2)(d) specifically defines the "maintenance, destruction, operation, and upkeep of a sewer system" as a proprietary function. R.C. 2744.02(B) lists the following exceptions to immunity:

Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:

(1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority.

* * *

(2) Except as otherwise provided in sections 3314.07 and 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.

(3) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads, except that it is a full defense to that liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge.

(4) Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code.

(5) In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code, including, but not limited to, sections 2743.02 and 5591.37 of the Revised Code. * * *

{¶ 19} Appellant argued the only potential exception to its immunity was subsection (B)(2). Attached to the motion were numerous exhibits relating to the weather and the maintenance records during the time in question (Exhibits B-F). Appellant also attached the July 15, 2016 report and accompanying exhibits (Exhibit A) and affidavit of its expert, Scott Ellsworth, a licensed professional engineer, who averred the following in pertinent part:

3. I have personal knowledge of the events described in Plaintiff's Complaint and also have reviewed various documents in the litigation, as well as records retained by Stark County and have discussed this matter with counsel for and employees of Stark County to further acquaint myself more fully with the facts and issues in this case.

4. On or about July 15, 2016, I personally prepared a "study of the Sanitary Wastewater Inundation of 7700-7732 Peachmont Ave. NE on June 18, 2014" (the "Report") and a copy of that report is attached hereto as Exhibit 2 and incorporated herein by reference.

5. My Report is based upon my own personal background, experience, expertise and knowledge and the conclusions contained within the Report represent my opinions based upon a reasonable degree of professional certainty.

6. As set forth in greater detail in my Report, it is my opinion, to a reasonable degree of professional certainty, that the sewer backup that occurred at the property located at 7700-7732 Peachmont Ave. NE, North Canton, Ohio 44720 (the "Property") on June 18, 2014 was solely and proximately caused by torrential rain and not as a result of any negligent maintenance, operation or upkeep on the part of Stark County or any third party.

7. As set forth in greater detail in my Report, it is my opinion, to a reasonable degree of professional certainty, that the planning, design and construction of the Waltham gravity lift station ("Waltham") that services the

Property are adequate and sufficient, and in compliance with the Environmental Protection Agency's <u>Recommended Standards for Wastewater Facilities</u>, to properly transport and dispose of wastewater derived from all users on lines feeding into Waltham, including the Property.

{¶ 20} In his report in Section I, Mr. Ellsworth explained how the pumps in the sanitary sewer system operate. He opined the design of the sanitary system satisfied both "reasonable engineering calculations for expected wastewater flow as well as the Environmental Protection Agency's rules for design capacity." In Section II, Mr. Ellsworth explained the two pumps at the Waltham Lift Station were checked several times on June 18, 2014, and were found to be functioning properly, pumping a total of 337,190 gallons of water from the morning of June 17th to the afternoon on June 18th. He stated the average daily flow at the lift station from June 2013 to June 2015 was approximately 93,000 gallons. Mr. Ellsworth noted because of the extreme rainfall the week of June 15th, "[t]he soil, the stream and the storm sewer system could not assimilate this amount of water in such a short period of time. The rain ran off of the flooded soil, filled the stream, overflowed the storm system and added hydrostatic pressure to the underground utilities." He explained the following:

There were observations from our service crews that portions of the streets along Peachmont, Moeller, and Chestnut Hill were flooded (See Exhibit 5). Even though the elevation of these streets are higher than the estimated flood elevation of the stream, the street's drainage system could

not collect the volume of water that was deposited on them from the storm. Therefore, the streets flooded until the storm drainage system could catch up. As the sanitary manholes in these roads are not water tight, the sanitary collection system became flooded as well. When a major storm event such as this occurs, manholes taking on storm water are not usually the only source of water inundation. When an open pipe exists below a flooded surface and an increase in hydrostatic pressure occurs due to flooding overhead, water will find its way into the system through manhole castings that have sunk below the as-built construction elevation or through faulty chimney seals. Other venues for water intrusion include illegal yard drains or foundation drains connected to sump pumps that pump into the sanitary sewer instead of the storm water system as intended.

***

Finally, as 7700-7732 is one of the last buildings on the gravity sanitary sewer line prior to entering the sanitary lift station, storm water in the sanitary pipe would have been flowing at a high velocity and volume so that the sanitary lift station could not keep up with the flow, even with two pumps working. The excess water would find relief through the basement drain at 7700-7732 Peachmont Ave. If this were the case, other properties with lower elevation basements would have experienced wastewater intrusion as well. This was the case as 7906 Peachmont (not shown) and 7756-7754 Peachmont, which were affected as well. These are indicated on Exhibit 4.

{¶ 21} Mr. Ellsworth concluded the weather situation caused the flooding, as the sanitary sewer system was adequately designed and properly maintained.

{¶ 22} Appellant also attached as exhibits the May 31, 2016 report (Exhibit G) of appellee's expert, Joseph Schaller, a licensed professional engineer, and exerts from his deposition (Exhibit I). We note the "report" is in the form of a letter to appellee's attorney. It is not accompanied by an affidavit. "It is well settled that documents submitted in opposition to a motion for summary judgment must be sworn, certified or authenticated by affidavit to be considered by the trial court in determining whether a genuine issue of material fact exists for trial." *Sintic v. Cvelbar,* 11th Dist. Lake No. 95-L-133, 1996 WL 649137, *2 (July 5, 1996). *See Heard v. Aultman Hospital,* 5th Dist. Stark No. 2015CA00141, 2016-Ohio-1076, ¶ 27-29; Civ.R. 56(C). However, appellant did not make a motion to strike the Schaller report and in fact attached the report to its motion for summary judgment.

{¶ 23} In his report, Mr. Schaller acknowledged "the rainfall event that occurred on June 18, 2014, could be considered to be classified as a 100 year rainfall event." However, he noted the rainfall event "did not lead to overland surface flooding of the units that contributed to the damages. There were no reports that indicated that surface water entered the units from the patios adjacent to the West Branch of Nimishillen Creek." Mr. Schaller opined the following:

Based on the data made available and the information provided, it is my opinion that the cause of the sewage backup and subsequent flooding

that occurred at 770-7732 Peachmont Avenue on June 18, 2014 is attributable to the backup of the public sanitary sewer system. The discharge flow rates recorded at the plant of 0.365 mgd may have been elevated beyond normal but should still should have been contained within an 8" sewer installed at OEPA accepted minimum grades of 0.4%. The fact that there was no overflow reported on or after the day of the rainfall event, further confirms that the cause of the backup (which occurred through the sewer floor drains) was related to the lack of proper function in the gravity sections of the sanitary sewer system or due to a system backup or flooding of the lift station that allowed extraneous storm water to enter the system.

It is my further opinion that a system backup, such the one that appears to have occurred on June 18, 2014 could therefore, only be attributable to lack of proper system maintenance [of] the gravity sewers or due to the lack of protection from flooding of the lift station. Both the system maintenance and the protection of the pumping station from flooding are the direct responsibility of Stark County.

{¶ 24} In his September 1, 2016 deposition, Mr. Schaller acknowledged he did not review the designs of the Waltham Lift Station or the actual sewer lines in the area. T. at 46-47. He had no knowledge of the depth or condition of the sewer lines. T. at 47. In determining causation for the flood, Mr. Schaller "looked at the specific type of backup that occurred, and knowing that it was most likely related to an overload of sanitary sewer

system because the floor drains had backed up."  *Id.*  When questioned about the excessive rainfall, Mr. Schuller explained the following (T. at 57-59):

> A. Well, the rainfall led to high amount of storm runoff, which led to flooding of areas; okay?  That link then is flooding of areas impacted the sanitary sewer system.  My report says the failure to keep that separation between storm water and the sanitary sewer system is part of the cause of the maintenance issue.
>
> Q. Is part of the cause.  What are the other causes?
>
> A. Potentially, I have not seen anything that ruled out condition defects within the sanitary system.
>
> ***
>
> Q. Well, let me finish.  You have not examined the condition or any reports relating to the condition of the sanitary sewer system; isn't that correct?
>
> A. That's correct.
>
> Q. So how would you have any idea what the condition is?
>
> ***
>
> A. Based on my experience, sewer condition is one of the factors in sanitary sewer that you need to be aware of.  The potential for sewers to receive groundwater and other flow, for sanitary sewers, is something that should be a concern simply because that water was never designed or intended to be within that system.  The other problem or issues that I've

seen that impact the capacity of the sanitary system are potential solids buildups or grease buildups within the system, which is always a maintenance issue in areas depending on what's tied into them. And also, then how does - - how tight is the system, how does the sanitary act when groundwater rises, when streets are flooded.

{¶ 25} Mr. Schaller did not see any data tending to show grease or roots in the system as a contributing factor to the flooding on June 18, 2014, and was not aware of any cracks in any pipe or any joints that were broken that would have allowed flood waters to enter the sanitary sewer system. T. at 59-60, 82-83. He relied on the maintenance records contained in Mr. Ellsworth's report which indicated the sewer lines were last cleaned between June 2012 and July 2013 prior to the flooding in 2014. T. at 60; Ellsworth Report at Section IV. Mr. Schaller testified a reasonable time frame to clean sewer lines is every five years, but depending on a number of factors such as grease buildup and root intrusion, maybe two or three years. T. at 61. Mr. Schaller did not see the floor drain of the subject property, and did not know how deep the lateral sewer line was that serviced the property. T. at 65. He acknowledged the property was build adjacent to a FEMA designated 100-year floodplain, meaning in any 100-year period, "there would be a 1 percent chance of this flood occurring." T. at 67-68. He agreed to the following (T. at 83):

Q. And looking at it not on a daily, not on an average, not on an acceptable amount of rainfall that enters it [the sanitary sewer system],

looking at it specifically on June 18, 2014, if you had a properly maintained

sewer system that doesn't flood regularly, is it possible that this amount of

rainfall alone could cause that system - - interference with that system?

A. I would say yes, it's possible.

{¶ 26} Mr. Schaller identified three possible causes of the flooding: lack of proper function in the gravity sections of the system, system backup, or flooding of the lift station. T. at 87. He opined all would be the result of maintenance issues. T. at 88-89.

{¶ 27} In its November 14, 2016 opposition brief, appellee argued in reviewing the evidence most strongly in its favor, genuine issues of material fact exist as to whether the damages were caused by negligent maintenance.

{¶ 28} A hearing on the motion for summary judgment was not held. In its January 13, 2017 judgment entry denying the motion, the trial court concluded the following:

Upon review of the briefs filed, and the evidence submitted, including but not limited to the Affidavit of Scott Ellsworth and attached exhibits, and the deposition testimony of Joseph Schaller and attached exhibits, and in viewing the evidence in a light most favorable to the Plaintiff, the Court finds that there is a genuine issue of material fact as to whether the subject sewer system was properly maintained. Therefore, the Court denied Defendant's motion for summary judgment.

{¶ 29} We disagree with the trial court's decision. In order for appellant to be liable for damages under R.C. Chapter 2744, it must have been negligent in maintaining the sanitary sewer system. Under a summary judgment standard, appellant, as the moving party, must first demonstrate the absence of a genuine issue of material fact by specifically pointing to some evidentiary quality evidence which affirmatively demonstrates appellee, as the nonmoving party, has no evidence to support its claims. In reviewing the affidavit and report of Mr. Ellsworth, as well as the attached weather reports and maintenance records, we find appellant has met its burden. The Waltham Lift Station was regularly maintained, and was inspected on a daily basis. The pumps in the station were regularly serviced, and were checked several times on the day in question and although they were overwhelmed with the excessive rainfall, they were found to be functioning properly. In fact, the pumps functioned at over twice their design capacity throughout the rainfall event.

{¶ 30} Once appellant has met its burden, appellee has a reciprocal burden to set forth specific facts showing a genuine issue for trial. Appellee presented the report of Mr. Schaller, dated May 31, 2016, wherein he opined the system backup was caused by negligent maintenance. In his deposition taken September 1, 2016, Mr. Schaller acknowledged he did not look at the designs of the sewer station or the sewer lines servicing the property, and did not review any records relating to maintenance, operation, and upkeep of the Waltham Lift Station or the Bob-O-Link sewer plant other than those attached to Mr. Ellsworth's report. Mr. Ellsworth report is dated July 15, 2016. Mr. Schaller's opinion in his report, made a month and a half prior to Mr. Ellsworth report, was not based on any supporting data and was mere speculation. Mr. Schaller agreed the

amount of rainfall on the day in question could interfere with the operation of a properly maintained sewer system.

{¶ 31} We distinguish our decision, cited by appellee, in *Nimishillen Township Trustees v. State ex rel. Groffre Investments,* 5th Dist. Stark No. 2003 CA 00410, 2004-Ohio-3371. In that case, we affirmed the trial court's denial of the township's motion for summary judgment on the issue of sovereign immunity. The case involved flooding related to storm water ditches, not a sanitary sewer system. At ¶ 38, we specifically found the township "would not be entitled to the defenses contained in R.C. 2744.03(A)(3) and (A)(5) because the township 'produced no evidence of upkeep or reasonable diligence in the inspection and maintenance of the system.' Judgment Entry, Dec. 5, 2003, at 3." Such is not the case sub judice. Appellant has presented ample evidence of upkeep and reasonable diligence in the inspection and maintenance of the sanitary sewer system.

{¶ 32} Viewing the record in a light most favorable to appellee, we find appellee has not shown a genuine issue of material fact relating to the maintenance of the sanitary sewer system to overcome appellant's immunity under R.C. 2744.02(A)(1).

{¶ 33} Upon review, we find the trial court erred in denying appellant's motion for summary judgment.

{¶ 34} Assignment of Error I is granted. Assignment of Error II is moot.

{¶ 35} The judgment of the Court of Common Pleas of Stark County, Ohio is hereby reversed.

By Wise, Earle, J.

Delaney, P.J. and

Gwin, J. concur.


EEW/sg 628